**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DIGITAL DYNAMICS SOFTWARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 892 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| ECLIPSE GAMING SYSTEMS, LLC; ELITE | ) | |
| GAMES, LLC; and ACCELERATED | ) | |
| MARKETING SOULTIONS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER AND OPINION

Plaintiff Digital Dynamics Software, Inc. ("Digital") sued Defendants Eclipse Gaming Systems, LLC ("Eclipse"), Elite Games, LLC ("Elite"), and Accelerated Marketing Solutions ("AMS"), alleging that they used and copied certain computer software developed by Digital without authorization in violation of the Copyright Act of 1976, 17 U.S.C. § 501, and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. Currently before the Court is Defendants' Motion to Dismiss. (Dkt. 13.) For the reasons set forth below, Defendants' motion is granted without prejudice to Digital seeking leave to further amend Digital's and Anthony Antonucci's amended countercomplaint in *Eclipse Gaming Systems, LLC v. Antonucci*, No. 17 C 196 (N.D. Ill.) (the "2017 Lawsuit").

## BACKGROUND[1]

Digital and Eclipse have been engaged in litigation since June 2016, with the litigation before this Court commencing in January 2017. The Court will set out the factual and procedural background of this long running litigation as it pertains to the current action. *See*

---

[1] The Court takes the following allegations from the complaint and treats them as true for the purposes of this motion. *See Gillard v. Proven Methods Seminars, LLC.*, 388 F. App'x 549 (7th Cir. 2010).

*Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (explaining that a court may take judicial notice of matters in public record, including court documents, in deciding a motion to dismiss without converting it to a motion for summary judgment).

Plaintiff Digital is a corporation based in Lake Zurich, Illinois that generally provides software "solutions" for electronic gaming machines in the casino and gambling industry. Anthony Antonucci owns Digital (directly and beneficially through a trust) and serves as its president. (Dkt. 1) at ¶¶ 1, 9. In 2003, Digital developed source code and security software for gaming machines called the Slot Accounting Systems ("SAS") Engine. In 2006, Digital developed another software product called the SAS Gateway. *Id.* at ¶ 10. Digital also developed a Gaming Application-Programming-Interface Protocol ("GAP"), which it defines as a "definition of a set of messages that an electronic gaming machine, such as a slot machine, uses to communicate with a casino backend system." *Id.* at ¶ 8. Essentially, the GAP provides a universal mechanism for a gaming machine to communicate with a Casino Host System, regardless of whether the gaming machine is running SAS or some other type of software. *Id.* Although the complaint alleges that the GAP was developed in 2002 (*id.* at ¶ 102), the "GAP – Game API Protocol" was not copyrighted by Digital until December 21, 2016. *See* (Dkt. 1-1) (Certificate of Registration) (listing the year of completion as 2015). The distinction between the GAP and SAS Engine and SAS Gateway software is not entirely clear. According to Digital, the GAP Protocol "includes" the SAS Engine software. (Dkt. 1) at ¶¶ 14, 15, 17, 20, 22, 24, 28, 30, 31, 32, 33, 35, 40, 42, 44, 45, 52, 54, 55, 56, 58, 62, 64, 66, 67, 74, 75, 77, 78, 79, 81, 83, 85, 87, 89, 90, 102, 104, 124, 140; *see also id.* at ¶ 10 (the SAS "software applications are part of the GAP protocol"). *But see id.* at ¶ 12 ("The SAS Engine and the SAS Gateway are based upon the GAP Protocol rules and protocols. The GAP Protocol was independently created and written by

[Digital]").  That is, Digital's allegations in the current litigation appear to indicate the SAS Engine software appears to be a part of or somehow contained within the GAP Protocol.

In 2008, Antonucci and others came together to form Eclipse, a Texas limited liability company, that works to "build and assemble electronic gaming machines to deploy into casinos and other gambling or gaming facilities for the purpose of earning revenue and entering into revenue sharing agreements with casinos and gambling or gaming facilities." *Id.* at 15.  The machines need software to operate, and therefore Eclipse "sought to license the GAP Protocol software, including the SAS Engine" from Digital.  *Id.*  Digital thereafter orally agreed to license the "GAP Protocol, including the SAS Engine, on Eclipse owned and operated electronic gaming machines" at a cost of $100 per machine, plus the cost of a "license dongle"—an external device that contains a security key that communicates with the software and must be plugged in to enable software operations.  *Id.* at ¶¶ 17, 21, 110; *see Eclipse Gaming Sys., LLC v. Antonucci*, 2017 WL 3071258, at *1 (N.D. Ill. July 18, 2017).  The dongles were produced by a third-party supplier, Gemalto.  (Dkt. 1) at ¶¶ 110–111.

On March 14, 2015, Digital and Eclipse signed a written Master License Agreement ("MLA") which granted Eclipse a "limited, nonexclusive license during the term of this MLA to use, sell, import, export, distribute, transmit, reproduce and publicly display copies of [the SAS Engine software and SAS Gateway] as electronic files . . . ."  (2017 Lawsuit, Dkt. 1-2) (Master License Agreement) at 2, 3; *see also Eclipse Gaming Sys., LLC*, 2017 WL 3071258, at *1.  Through the MLA, Eclipse agreed to pay Digital a one-time "run-time" license fee of $100 for each gaming machine, plus a quarterly maintenance fee of $5,000 for all the machines.  *Eclipse Gaming Sys., LLC*, 2017 WL 3071258, at *1.  The MLA further describes the license rights

granted to Eclipse and details Eclipse's promises regarding dissemination (sale, transfer, sublease, etc.) of the software. *See* (2017 Lawsuit, Dkt. 1-2) at 2–3, 5–6.

At some time before July 2015, Defendant Elite—an LLC that is wholly owned by David Lawrence and Greg Drew—and Robert Drew together became the majority owners of Eclipse. In July, Elite and Robert Drew removed Eclipse's manager and installed Greg Drew as the new manager. (Dkt. 1) at ¶¶ 3, 25. In September, Greg Drew fired three members of the Eclipse management team, including Antonucci, the Chief Technology Officer. Antonucci's termination, however, was rescinded and he remained employed. *Id*. at ¶ 25. Around this time, Antonucci allegedly "became suspicious that Eclipse was wrongfully copying [Digital's] software, including the GAP Protocol and SAS Engine," so Digital and Antonucci demanded an accounting of the number of electronic gaming machines that contained copies of the Digital software. *Id*. at ¶¶ 26, 107. Antonucci also requested financial information relating to Eclipse's contracts and revenues earned from its electronic gaming machine operations, including its Weekly Cash Summary Reports. *Id*. at ¶ 108. Eclipse did not provide the accounting or financial information.

In May 2016, Antonucci contacted other shareholders of Eclipse to request a buy-out of his 17.18% membership interest in Eclipse. *Id*. at ¶ 116; *Eclipse Gaming Sys., LLC*, 2017 WL 3071258, at *1. The other shareholders rejected his offer, and Eclipse sought to enforce the terms of the MLA.

## A.     The 2016 State Court Proceedings

On June 16, 2016, Digital filed suit in the Cook County Circuit Court against Eclipse seeking a declaratory judgment that the MLA was null and void and unenforceable. (Dkt. 1) at ¶¶ 116, 117; *Eclipse Gaming Sys., LLC*, 2017 WL 3071258, at *1; *see also* (Dkt. 14-1) at Ex. 2

(Verified Complaint for Declaratory Relief). The complaint was later amended to include claims brought by Antonucci for breach of fiduciary duty against Greg Drew and Boris Amegadjie (Eclipse's current Chief Executive Officer) related to, among other things, Eclipse's alleged failure to provide requested business information to Antonucci, namely an accounting and access to Eclipse's books and records. *See* (2017 Lawsuit, Dkt. 15-2) (Amended Verified Complaint for Declaratory Relief).

On August 25, 2016, while the lawsuit was pending, Eclipse terminated Antonucci's employment. *Eclipse Gaming Sys., LLC*, 2017 WL 3071258, at *1. Then, on November 30, 2016, Eclipse filed a new suit against Digital in the Circuit Court of Cook County, alleging that Digital had threatened to render the SAS Engine software on several hundred of Eclipse's gaming machines inoperable. Specifically, Eclipse alleged that on November 18, 2016, Digital sent Eclipse a letter stating that "unless Eclipse pays Digital $300,000 and enters into a new master license agreement with Digital, the 'SAS Engine [software] will become un-operable in December'" and indicated that Eclipse needed to purchase new dongles to continue operating their machines. (2017 Lawsuit, Dkt. 22-2) (Verified Complaint for Declaratory Judgment, Anticipatory Breach/Breach of Contract, And Specific Performance) at ¶ 13. Accordingly, Eclipse sought to enjoin Digital from disrupting the software, a declaration that the MLA is valid and enforceable, and an order directing Digital's specific performance, requiring Digital to deliver necessary software updates without rendering the gaming machines inoperable. *Id*. at 6; *Eclipse Gaming Sys., LLC*, 2017 WL 3071258, at *1.

On December 5, 2016, the state court heard Eclipse's motion for a temporary restraining order, which it granted. *Eclipse Gaming Sys., LLC*, 2017 WL 3071258, at *2; *see also* (2017 Lawsuit, Dkt. 52) at 5–6 (12/5/16 Agreed Order). As per an agreement between the parties,

Eclipse purchased 500 dongles from Digital for use with their electronic gaming machines for $65,000, comprised of $15,000 for the actual dongles, and $50,000 for license fees. (2017 Lawsuit, Dkt. 52) at 5. Upon receipt of the dongles, Eclipse implemented emergency procedures to avoid the shutdown, including performing tests, warning clients of the possibility of shutdown, sending technicians to casino locations across the country, and deploying personnel at client locations to monitor the machines' performance. Despite these emergency procedures, some of Eclipse's machines shut down for approximately seven days as a result of Digital's software modification. *Eclipse Gaming Sys., LLC*, 2017 WL 3071258, at *2.

**B.      The 2017 Lawsuit**

On January 10, 2017, Eclipse brought a nine-count complaint against Antonucci, *Eclipse Gaming Systems, LLC v. Antonucci*, 17 C 196 (N.D. Ill.). Specifically, Eclipse alleged that Antonucci had violated two provisions of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51, when he secretly programmed and installed "an expiration date or a 'time bomb'" in updated versions of the SAS Gateway and SAS Engine software that required Eclipse to buy new dongles or else have its machines rendered inoperable on December 7, 2016. (2017 Lawsuit, Dkt. 1) at ¶¶ 33, 38, 85, 72–97. Although Eclipse had brought the state court action, received a temporary restraining order, and purchased 500 dongles that could override the "time bomb," some of its machines had shut down on account of the time bomb. *Id.* at ¶¶ 49–51. Eclipse alleged that the shut downs caused it substantial expense in implementing remedial measures and lost revenue, as well as harm to its goodwill and reputation with its customers.

In addition to the computer claims, Eclipse asserted multiple other state common law claims. *See id.* at ¶¶88–98 (tortious interference with contractual relations under Illinois

common law), ¶¶ 99–107 (breach of fiduciary duty as employee under Illinois common law), ¶¶ 108–16 (breach of fiduciary duty as employee under Georgia common law), ¶¶ 117–21 (breach of employment agreement under Georgia common law), ¶¶ 122–30 (breach of fiduciary duty of a Texas limited liability company under Texas common law), ¶¶ 131–39 (conversion under Illinois common law). These claims are largely predicated on allegations that Antonucci had interfered with Eclipse's ability to purchase dongles by telling Gemalto that Digital was the owner of the security keys contained within the dongles. In particular, according to Eclipse, while employed as the CTO, Antonucci had the authority to act on Eclipse's behalf in authorizing Gemalto to make dongles for Eclipse's gaming machines, and he was responsible for ordering the four kinds of dongles used on Eclipse's machines. *Id*. at ¶¶ 57–59. On November 3, 2016, Eclipse submitted a routine purchase order for several hundred dongles with the MAMMC and RWIID security keys. *Id*. at ¶ 61. But because Antonucci had instructed Gemalto not to sell dongles to Eclipse, Gemalto informed Eclipse that it was no longer authorized to purchase any dongles. *Id*. at ¶¶ 62–64. As a result, Eclipse has been unable to obtain any dongles without Antonucci's approval—which Antonucci has withheld. All told, Eclipse seeks damages, disgorgement of Antonucci's compensation from June 17, 2016 to August 25, 2016, forfeiture of his membership interest in Eclipse, an injunction prohibiting Antonucci from taking certain actions with regard to Gemalto, punitive damages, fees and costs. *Id*. at 25–26.

Antonucci moved to dismiss the Computer Fraud and Abuse Act claims as insufficiently pled, and the Court denied the motion. (2017 Lawsuit, Dkts. 15, 23); *see also Eclipse Gaming Sys.*, 2017 WL 3071258. On August 8, 2017, Antonucci filed an 25-page countercomplaint against Greg Drew, David Lawrence and Boris Amegadjie. (2017 Lawsuit, Dkt. 25-1). On October 6, 2017, Antonucci petitioned the Court for a temporary restraining order against David

Lawrence. (2017 Lawsuit, Dkt. 41). As relevant, the petition stated that "Antonucci has determined that Eclipse uses [Digital's] software without paying licensing fees, that it has installed [Digital's] software on machines owned or operated by [Elite] and [AMS]. . . . Licensing fees remain due and owing for the use of the SAS engine and SAS Gateway software and Eclipse has refused to provide an accounting of the number of electronic gaming machines using the [Digital] software." *Id*. at 2. The petition largely complained about David Lawrence's and Greg Drew's actions in managing and running Eclipse, and it specifically sought to prevent David Lawrence from purchasing the membership interests of two other members, allegedly in violation of the Eclipse Operating Agreement. *Id*. After conducting a hearing on the motion, the Court denied it as moot. (2017 Lawsuit, Dkt. 44).

On January 29, 2018, Antonucci filed an amended eight-count countercomplaint against Eclipse, Greg Drew and David Lawrence, in which Digital joined him as a counter-plaintiff. (2017 Lawsuit, Dkt. 51). There, Antonucci and Digital alleged the following: (1) a member derivative action against Greg Drew and David Lawrence for breaches of their fiduciary duties and corporate waste; (2) declaratory judgment actions seeking declarations that the Master License Agreement is unenforceable for various reasons; (3) a claim for breach of Antonucci's employment agreement with Eclipse and wrongful discharge; (4) a claim for injunctive relief, seeking in part the production of business information; and (5) a claim for breach of fiduciary duty and violation of the minority oppression doctrine. *Id*. As relevant, the countercomplaint clarifies that Elite and AMS (another LLC that is wholly owned by Drew and Lawrence), were both distributors of Eclipse gaming machines that paid Eclipse a certain percentage of the gross revenue received from casino accounts. In addition, the countercomplaint alleges that Eclipse "provided the SAS Engine to machines owned or operated by" Elite and AMS. *Id*. at ¶ 41. With

this background, the fiduciary duty and corporate waste claims are based on Greg's and Lawrence's actions of allegedly allowing revenue belonging to Eclipse from one of its clients, the Speaking Rock Casino in El Paso, Texas, to be paid to Elite and/or AMS; refusing to produce to Antonucci financial information and reports concerning Elite's and/or AMS's financial obligations to Eclipse with regard to the Speaking Rock Casino and an Alabama casino, Rivers Edge Casino; allowing Elite and AMS to maintain machines and servers using Eclipse's resources for free; collecting excessive and unnecessary expenses and inflated salaries from Eclipse; maintaining excessively large and extravagant offices for Eclipse; and otherwise mismanaging Eclipse. *Id*. at ¶ 26. As relief, Antonucci and Digital seek damages, back pay, lost benefits, disgorgement of Drew's and Lawrence's salaries and other compensation, restitution, a declaration that the Master License Agreement is void and unenforceable, and various forms of injunctive relief, including an order requiring Eclipse to produce an accounting and certain information and records and an order removing David Lawrence as the manager of Eclipse.

## C.     The 2018 Lawsuit

Just four days after filing the amended countercomplaint in the 2017 Lawsuit, Digital brought the current lawsuit against Eclipse, Elite, and AMS, alleging multiple counts of copyright infringement—direct and vicarious—and numbers violations of the DMCA. (Dkt. 1). Digital alleges that Elite owns or operates 650 gaming machines at the Speaking Rock Casino and 230 machines at the Rivers Edge Casino, and that Elite and AMS own and/or operate thousands more gaming machines across the United States. *Id*. at ¶¶ 24, 82. With respect to the infringement claims, Digital alleges that Eclipse copied the GAP Protocol, including the SAS Engine software, onto more than 1000 electronic gaming machines—its own machines and those owned or operated by Elite and AMS—in violation of the oral agreement between Eclipse and

Digital, without authority or permission from Digital, and despite the fact that Eclipse has only paid Digital 832 license fees. *Id*. at ¶¶ 16–22, 74. Digital further alleges that Elite and AMS unlawfully copied the GAP Protocol, including the SAS Engine, onto their own gaming machines at Speaking Rock Casino and Rivers Edge Casino without any license agreement from Digital or paying Digital. *Id*. at ¶¶ 33–36, 56–59.

Digital also brings claims pursuant to the DMCA, which addresses liability for circumventing systems that protect copyrights. *See* 17 U.S.C. § 1201(a)(1)(A) ("No person shall circumvent a technological measure that effectively controls access to a work protected under this title."). Here, Digital alleges that after Eclipse failed to comply with Antonucci's information demands, Digital "updated its software in January 2016 to restrict access to only users who had a valid license. The software update was designed to begin checking for licenses effective upon the date of December 7, 2016." (Dkt. 1) at ¶¶ 105–09. Digital calls this the "License Verification." *Id*. Digital also "terminated the authority of Eclipse to order [Digital's] RWIID dongles from Gemalto." *Id*. at ¶ 122. It was not until November 10, 2016 that Digital "issued notice to Eclipse that unlicensed copies of its software would no longer operate," thereby causing Eclipse to file its state court lawsuit and pay Digital $65,000 for 500 RWIID dongles. *Id*. at ¶¶ 119, 121. Still, Digital alleges that in 2017, Eclipse reverted to an older version of the SAS Engine software that did not contain any license verification or operation disruption measures. *Id*. at ¶¶ 124–25, 128. According to Digital, "Eclipse would have no cause to install older versions of the GAP Protocol or SAS Engine software onto any properly licensed electronic gambling machine, [therefore] Eclipse must have copied unlicensed software onto an unknown and undisclosed number of electronic gaming machines" both owned by Eclipse and by Elite and/or AMS. *Id*.

**LEGAL STANDARD**

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), this Court construes all facts in the light most favorable to the non-moving party. *See Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 622 (7th Cir. 2012). The Court also takes all well-pleaded factual allegations as true. *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). The Court may take judicial notice of matters in public record, including court documents, in deciding a motion to dismiss without converting it to a motion for summary judgment. *Henson*, 29 F.3d at 284.

**DISCUSSION**

Defendants Eclipse, Elite, and AMS move to dismiss the 2018 Lawsuit on multiple grounds. Defendants argue that (1) the claims in the 2018 Lawsuit arise from the same operative facts as Antonucci's and Digital's counterclaim in the 2017 Lawsuit and therefore cannot be alleged in an independent suit; (2) Digital's copyright infringement claims are barred by the work-for-hire doctrine and Antonucci's employment agreement; and (3) Digital's DMCA claims fail to state a claim under that statute. (Dkt. 14). Because Defendants' claim-splitting argument is dispositive, the Court will refrain from addressing Defendants' other arguments for dismissal.

**I.      Claim Splitting**

Defendants argue that Digital's claims in the present suit must be dismissed because they arise from the same set of operative facts underlying the 2017 Lawsuit—including those supporting Digital's and Antonucci's counterclaim, which was filed mere days before the complaint in the current copyright proceeding. Under the doctrine of claim splitting, a form of *res judicata*, a party cannot split a cause of action into separate grounds of recovery and bring

successive lawsuits. *Nalco Co. v. Chen*, 843 F.3d 670, 674 (7th Cir. 2016); *Kim v. Sara Lee Bakery Grp., Inc.*, 412 F. Supp. 2d 929, 941 (N.D. Ill. 2006).[2] Rather, a party must bring in one lawsuit "all legal theories arising out of the same transaction or series of transactions." *Kim v. Sara Lee Bakery Grp., Inc*., 412 F. Supp. 2d 929, 941 (N.D. Ill. 2006); *see also Chicago Title Land Tr. Co. v. Potash Corp. of Saskatchewan Sales*, 664 F.3d 1075, 1081 (7th Cir. 2011) ("[T]he principle that *res judicata* prohibits a party from later seeking relief on the basis of issues which might have been raised in the prior action also prevents a litigant from splitting a single cause of action into more than one proceeding."); *Wilson v. City of Chicago*, 120 F.3d 681, 686 (7th Cir. 1997) ("Two claims arising from the same set of facts are one claim for *res judicata* purposes, and may not be split . . . by making each claim the subject of a separate suit[.]"); Restatement (Second) of Judgments § 24, comment d ("When a defendant is accused of . . . acts which though occurring over a period of time were substantially of the same sort and similarly motivated, fairness to the defendant as well as the public convenience may require that they be dealt with in the same action."). "As a general rule, a federal suit may be dismissed for reasons of wise judicial administration . . . whenever it is duplicative of a parallel action already pending." *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993)) (citation and internal quotation marks omitted). Unlike *res judicta*, the doctrine of claim splitting applies before there is a final judgment in a prior action. *Anderson v. Guaranteed Rate, Inc.*, 2013 WL 2319138, at *4 (N.D. Ill. May 28, 2013); *Kim*, 412 F. Supp. 2d at 941–42; *CIVIX-DDI, LLC v. Expedia, Inc.*, 2005 WL 1126906, at *4 (N.D. Ill. May 2, 2005) (collecting cases).

---

[2] Neither party addresses the applicable preclusion law. But since both the 2017 Lawsuit and the instant action are predicated on federal-question jurisdiction (that is, the 2017 Lawsuit brings bases its jurisdiction on Computer Fraud and Abuse Act claims, and instant suit bases its jurisdiction on the Copyright Act and the DMCA), "[t]he preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008); *see also Firishchak v. Holder*, 636 F.3d 305, 308 (7th Cir. 2011).

Digital makes three general arguments as to why the doctrine of claim splitting should not apply:  the two actions involve "a different set of actions involving different parties" and the damages sought in the two actions are different.  *See* (Dkt. 20).  The Court will address each argument in turn.

## A.      Identity of Causes of Action

Digital first generally argues that the "actions asserted" in the 2017 Lawsuit and the present case "do not arise from the same incidents, events or transactions."  (Dkt. 20) at 3.  These arguments, however, are shortsighted and underdeveloped.  That is, they are supported only by Digital's repeated conclusory statements that they actions are different, not by any relevant case law.  *See, e.g.*, (Dkt. 20) at 3 ("An examination of the [counterclaims in the 2017 Lawsuit] demonstrates the actions and parties are not the same—there is no unity.").  Digital breaks down the counts contained in its counterclaims in the 2017 Lawsuit and argues that each one involves a discrete set of parties and characteristics that make it different from any of the copyright claims asserted here.  *Id.* at 3–4.  For example, Digital attempts to distinguish the two actions on the basis of the legal theories alleged, arguing that two of the eight counts in the counterclaims involve the "fiduciary duties and statutory obligations owed by Drew and Lawrence," which are wholly separate and distinct from the facts pertaining to the [copyright case]."  *See* (Dkt. 20) at 3.  Part of the confusion likely results from Digital's misstatement of the preclusion standard: Digital argues that the operative facts underlying its amended countercomplaint in the 2017 Lawsuit are not "identical" to those underlying the current proceeding.  *See* (Dkt. 20) at 2, 5, 7.

However, instead of looking myopically at the specific legal theories asserted or individual facts alleged to find an exact match, the Court looks to the transactions underlying the 2017 Lawsuit as a whole, not just those specifically attached to each of the counterclaims.  *See*

*Nalco Co.*, 843 F.3d at 674 ("Having elected to take the offensive, [the defendant] was obliged to raise all claims that stem from the same transaction or series of related transactions (what courts sometimes call the 'core of operative facts').").  Section 24 of the Restatement (Second) of Judgments teaches:

> What factual grouping constitutes a "transaction" and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

Restatement (Second) of Judgments § 24(2); *see Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 382–83 (1985) (Restatement of Judgments reflects contours of federal common law of claim preclusion).  In other words, a cause of action is defined as "a 'single core of operative facts' which give rise to a remedy." *Petit v. City of Chicago*, 766 F. Supp. 607, 611 (N.D. Ill. 1991) (quoting *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 854 (7th Cir. 1985)). Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit.  *See Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 593 (7th Cir. 1986).  Thus, a "mere change in the legal theory does not create a new cause of action." *Petit*, 766 F. Supp. at 611.  In other words, that separate suits are different in some respects, including the legal theories advanced and some of the facts a claimant intends to use to prove its right to relief, is not enough to defeat a finding that two claims rely on the same fundamental facts.  *Ross ex rel. Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 283 (7th Cir. 2007).  This principal is set forth in § 25 of the Restatement:  "The rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action (1) To present evidence or grounds or theories of the case not presented in the first action, or (2) To seek remedies or forms of relief not demanded in the first action." Restatement (Second) of Judgments § 25; *see also Nalco Co.*, 843 F.3d at 674.

Looking then at the factual circumstances undergirding the two actions, the 2017 Lawsuit and the present copyright action arise out of the same transactions or occurrences, specifically (1) the parties' agreement regarding Eclipse's use of the SAS Engine software (oral and/or MLA) and (2) Elite and/or AMS machines at establishments including the Speaking Rock Casino and Rivers Edge Casino and Eclipse's involvement with these machines.  *See* (2017 Lawsuit, Dkt. 25) (Answer) at 1 ("At the heart of this litigation is [Eclipse's] unauthorized use of [Antonucci's] SAS Engine Software.  The use was unauthorized because [Eclipse] failed to pay the required license fees."); (2017 Lawsuit, Dkt. 57) ("The [amended counterclaim] alleges that Eclipse provided the SAS Engine to [Elite] . . . . and that Eclipse has failed to account for the number of machines using the SAS Engine and has failed to pay licensing fees due and owing to [Digital].”); (Dkt. 1) ("The actions identified in the Complaint arise from the unauthorized use and copying of computer software commonly known as the 'GAP Protocol'," which includes the SAS Engine software).[3]  Although Digital attempts to factually distinguish the two actions, its narrow arguments fail for the following reasons.

### 1. Copyright Infringement Claims (Counts I, II, III, and IV)

First, the doctrine of claim splitting precludes Digital from bringing claims based on the use of the SAS Engine software on Eclipse gaming machines (Count III).  The 2017 Lawsuit involves the agreements between Digital and Eclipse for use of the SAS Engine software on its gaming machines.  Specifically, Eclipse's claims involve the "time bomb's" disruption of the software and the operation of its machines; Antonucci's and Digital's counterclaims involve the overall enforceability of the 2015 MLA between the parties.  *See* (2017 Lawsuit, Dkts. 1, 51).

---

[3] Digital notably does not argue that the GAP Protocol and the SAS Engine are separate and different computer applications, nor could it in good faith argue as such based on the allegations in the complaint. (Dkt. 1).  Therefore, any distinction between the two programs, to the extent that there is one, is not fatal to the Court's analysis.  Indeed, Digital's response contends that the two programs are not licensed separately and that they are "inherently linked."  *See* (Dkt. 20) at 8.

The copyright-infringement claim against Eclipse in the present lawsuit, that Eclipse copied the software—the GAP Protocol, including the SAS Engine—onto more than 1,000 machines while only paying 832 license fees, directly implicates the licensing agreement(s) between the parties. *See* (Dkt. 1) at ¶¶ 73–95. Therefore, Count III is based on the same operative facts underlying the 2017 Lawsuit, namely the parties' licensing agreements and their compliance therewith.

Digital's claims regarding the use of the SAS Engine software on Elite and AMS machines (and its claim for "vicarious infringement" by Eclipse based on software use on Elite and/or AMS machines) (Counts I, II, and IV) are also precluded by claim-splitting. Specifically, both suits involve Elite and/or AMS machines placed at the Speaking Rock Casino and Rivers Edge Casino either by contract with Eclipse or otherwise. In the 2017 Lawsuit, Digital and Antonucci assert a two counterclaims against Drew and Lawrence in part for actions taken as managers of Eclipse from September 2015 to the present, either personally or through the current manager, related to (1) revenue from (a) more than 600 gaming machines at the Speaking Rock Casino that was allegedly diverted away from Eclipse and to Elite and AMS and (b) gaming machines at the Rivers Edge Casino that was not received by Eclipse, and (2) Elite's and AMS's other instances of failing to pay Eclipse for services. (2017 Lawsuit, Dkt. 51) at ¶ 26. Digital's claims in the current lawsuit that Elite, AMS, and Eclipse committed copyright infringement stem from the same alleged mismanagement and gaming machines at the Speaking Rock Casino and Rivers Edge Casino. That is, Digital's copyright infringement claims are based on the same operative facts underlying Digital's and Antonucci's counterclaims in the 2017 Lawsuit. It is not logical to argue that claims regarding the revenue generated by these specific machines should be tried separately from claims regarding the software used on the machines to generate that same revenue.

Further, Counts I, II, and IV also involves the parties' business understandings related to their licensing agreement(s), the scope of the agreements, and the parties' compliance with the agreements. *See* (2017 Lawsuit, Dkt. 1-2) at 2–3, 5–6 (describing the license rights granted to Eclipse including those regarding sale, transfer, sublease, etc. of the software). To the extent that Digital argues that its counterclaims regarding the validity of the MLA in the 2017 Lawsuit relate only to the proposed acquisition of Eclipse and that any facts or evidence supporting the copyright claims is not relevant to the counterclaims, this argument is without merit. (Dkt. 20) at 3–4. The MLA counterclaims and the infringement claims in this case unquestionably regard the parties' understanding regarding the licensing of Digital's software to Eclipse and Eclipse's actions of providing the SAS Engine software to machines owned or operated by Elite and AMS. *See* (2017 Lawsuit, Dkt. 51) at ¶ 41 (alleging, in support of the contract-validity counts, that Eclipse provided the SAS Engine to Elite and AMS machines).

## 2. Digital Millennium Copyright Act Claims (Counts V, VI, VII, and VIII)

In addition, the doctrine of claim splitting precludes Digital from bringing claims based on actions taken by Eclipse in connection with the December 7, 2017 "time bomb" or "License Verification." To start, there can be no serious dispute that the "time bomb" and "License Verification" are the same thing, as Digital itself recognizes. *See* (Dkt. 20) at 5 ("The Eclipse damages arise from the License Verification mechanism (aka 'time bomb')."). Accordingly, both the 2017 Lawsuit and Digital's DMCA claims involve the same set of operative facts— Eclipse's use of the SAS Engine software, the software disruption in December 2016, and Eclipse's actions following the disruption. Therefore, Digital's claims resulting from the December 2017 software disruption cannot be divided.

Digital acknowledges that the chronology alleged by Eclipse in the 2017 Lawsuit "is a subset of the chronology" for the instant copyright action, but it further argues that that the operative facts of the copyright action are more expansive because they include actions taken by Eclipse after the "time bomb"/License Verification was triggered in December 2016. (Dkt. 20) at 5–6. Although Digital is correct that its DMCA claims include allegations that go beyond December 2016, Digital is wrong that this fact creates a new, separate transaction or core of operative facts. To the contrary, Digital's arguments further confirm that its claims arise out of the same operative facts underpinning the 2017 Lawsuit. There, Eclipse alleges that some of its machines were rendered inoperable on account of the "time bomb" and that it suffered damages in the service disruption in bringing them back online still using the SAS Engine software. In this case, Digital takes issue with the steps that Eclipse has taken post License Verification to run the SAS Engine software. Both the 2017 Lawsuit and Digital's DMCA claims are based on the fallout from the "time bomb"/License Verification. Moreover, the MLA at issue in the 2017 Lawsuit grants Eclipse "the right to modify and maintain the Software directly as long as [Digital's] rights are acknowledged." *See* (2017 Lawsuit, Dkt. 1-2) at 3. This provides further support that the two cases are connected and cannot logically be separated.

**B.      Identity of Parties**

Next, Digital argues that since Elite and AMS are not parties to the 2017 Lawsuit, and since Greg Drew and David Lawrence are not parties to the current copyright action, the doctrine of claim splitting does not apply. However, "just as the adoption of a new legal theory will not salvage litigation arising from a set of facts that has already been litigated, a party may not avoid the rule against claim splitting by slightly altering the parties in subsequent actions." *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 2013 WL 5951505, at *3 (N.D. Ill. Nov. 7,

2013) (citing *Zarniecki v. City of Chicago*, 633 F.3d 545, 549 (7th Cir. 2011)). If the new parties are in privity with the parties in the original action, the doctrine of claim splitting will still apply. *See Zurich Capital Markets Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1048 (N.D. Ill. 2005). Courts apply a "functional approach" to determining whether parties are in privity. *Serv. Employees Int'l Union Local 1 v. Digby's Detective & Sec. Agency, Inc.*, 2009 WL 721003, at *2 (N.D. Ill. Mar. 18, 2009). "It is the identity of interest that controls in determining privity, not the nominal identity of the parties." *Chicago Title Land Trust Co.*, 664 F.3d at 1080 (citation and internal quotation marks omitted).

Digital has alleged that Drew and Lawrence are the sole owners of the membership interests of Elite and AMS. *See* (2017 Lawsuit, Dkt. 51) at ¶ 26(A) ("Elite is owned one-half by David Lawrence and one-half by Greg Drew."), ¶ 26(B) ("Like Elite, AMS is owned one-half by Lawrence and one-half by Drew."); (Dkt. 1) at ¶¶ 3, 4. For purposes of preclusion, "limited liability companies are in privity with their individual owners, particularly, as is the case here, when the owner[s have] exclusive control over the LLC." *Kramer v. Stelter*, 588 F. Supp. 2d 862, 867 (N.D. Ill. 2008); *see also VitalGo, Inc. v. Kreg Therapeutics, Inc.*, 2017 WL 1163741, at *7 (founder, owner, president, and CEO of corporation was in privity with corporation) (N.D. Ill. Mar. 29, 2017); *Arlin-Golf, LLC v. Vill. of Arlington Heights*, 2010 WL 918071, at *6 (N.D. Ill. Mar. 9, 2010) (LLCs are in privity with their individual owners; "[t]his is not surprising, given the close alignment of the interests of an LLC like [the plaintiff] with the interests if its two owners."), *aff'd*, 631 F.3d 818 (7th Cir. 2011); *Direct Marketing Concepts v. Trudeau*, 266 F. Supp. 2d 794, 796 (N.D. Ill. 2003) ("In light of [plaintiff's] self-created total control over both [LLCs] . . . it would represent the height of artificiality . . . to view the [LLC's] as anything other

than in privity with [plaintiff] as an individual."); *accord Carr v. Tillery*, 2010 WL 1963398, at *9 (S.D. Ill. May 17, 2010).

In addition to alleging that Drew and Lawrence own and control Elite and AMS, Digital has set forth further allegations that indicate that Drew and Lawrence are in privity with Elite and AMS. In particular, in setting forth its copyright-infringement claims, Digital alleges that Elite and AMS acted willfully or in conscious disregard of Digital's rights, because "[t]he owners of Elite, Greg Drew and David Lawrence, are controlling owners of Eclipse and are on actual notice that [Digital] has demanded that Eclipse account for Infringing Machines and terminate their unlawful copying behavior. Elite is actually aware that [Digital] has not been compensated for its copyrighted software – the GAP Protocol, including the SAS Engine – and that [Digital's] property is being copied without [Digital's] consent." (Dkt. 1) at ¶ 42; *see also id.* at ¶ 64 (asserting same allegations with respect to AMS). Digital's allegations rely on a unity of interest between Drew and Lawrence and Elite and AMS, and therefore its arguments to the contrary in opposition to Defendants' motion to dismiss are without merit.

## C. Damages

Finally, just as a change in legal theories does not create a new cause of action, a change in remedies sought also does not create a new cause of action if the remedies all arise from the same factual underpinnings. In other words, "it is the cause of action, and not the remedy, which determines whether claim preclusion applies: a claim can be barred even though the plaintiff seeks remedies or forms of relief not demanded in the original action." *Humphrey v. Tharaldson Enters., Inc.*, 95 F.3d 624, 626 (7th Cir. 1996) (citing *Pliska v. City of Stevens Point, Wisc.*, 823 F.2d 1168, 1172–73 (7th Cir. 1987)). Indeed, as explained in Restatement § 25, "[t]he rule of § 24 [against claim splitting] applies to extinguish a claim by the plaintiff against the defendant

even though the plaintiff is prepared in the second action . . . [t]o seek remedies or forms of relief not demanded in the first action." *See Nalco Co.*, 843 F.3d at 674. Accordingly, the fact that Antonucci's and Digital's counterclaims in the 2017 Lawsuit seek injunctive relief (an accounting and other business information), declaratory relief regarding the MLA, business damages, and employment damages does not mean that the current action seeking infringement damages is necessarily separate and distinct. And, for the reasons already laid out above, the Court concludes that the factual underpinnings of the remedies in both actions are the same. Digital's arguments to the contrary are circular and conclusory. *See* (Dkt. 20) at 5 ("Once [the "time bomb"] damages occur, the operative facts surrounding those damages constitute Eclipse's operative facts.").

In sum, the doctrine of claim splitting precludes Digital from bringing a separate action based on Defendants' use (or misuse) of the SAS Engine software, including claims that Defendants allegedly infringed on Digital's copyright through their implementation of any version of the SAS Engine software on gaming machines. And although Digital asserts, in a single sentence, that an "appropriate remedy would be to join the relevant count with the [amended counterclaims in the 2017 Lawsuit] pursuant to Rule 15(a)" ((Dkt. 20) at 7), this is not the proper manner in which to request leave to amend in the 2017 Lawsuit. *See, e.g.*, *VitalGo, Inc.*, 2017 WL 1163741, at *8 ("Plaintiffs' embedding of a request for leave to amend in a footnote of a response brief is improper."). Instead, if Digital wishes to purse its copyright-related claims in the 2017 Lawsuit, it must file a motion for leave to amend its counterclaims in that action.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss (Dkt. 13) is granted.

_____

Hon. Virginia M. Kendall
United States District Judge

Date: June 1, 2018